UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CAROL SHUGART,<br><br>Plaintiff,<br><br>vs.<br><br>ODYSSEY MARINE EXPLORATION, INC., MARK D. GORDON, MARK B. JUSTH, JON D. SAWYER, TODD E. SIEGAL, and LARISSA T. POMMERAUD<br><br>Defendants. | Case No. 26-cv-5768 |

# COMPLAINT

Plaintiff Carol Shugart ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Odyssey Marine Exploration, Inc. ("Odyssey" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Odyssey, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of Odyssey by American Ocean Minerals Corporation's ("Parent" or "AOM") wholly controlled subsidiary Oceanus Merger Sub, Inc. ("Merger Sub."), an

entity formed for the sole purpose of facilitating the present transaction (together with AOM and Merger Sub., "AOM").

2. On or about April 8, 2026, Odyssey entered into an agreement and plan of merger (the "Merger Agreement"), whereby AOMC will acquire Odyssey (the "Proposed Transaction") and shareholders of Odyssey common stock will receive 4.5017 shares of AOMC common stock for each share of Odyssey common stock they own (the "Exchange Ratio" or "Merger Consideration").

3. On or about May 11, 2026, in order to convince Odyssey shareholders to support the Proposed Transaction, the Board authorized the filing of a Form S-4 Registration Statement (the "Registration Statement") with the Securities and Exchange Commission ("SEC"). As detailed below, the Registration Statement is materially incomplete and misleading.

4. The special meeting at which Odyssey shareholders will cast their votes on the Proposed Transaction (the "Special Meeting") will be scheduled and the definitive solicitation material that will be used to solicit votes on the Proposed Transaction will be sent to Odyssey shareholders shortly. It is imperative that the material information that has been omitted from the Registration Statement be disclosed immediately so public stockholders may have time to consider the information that has been omitted and misrepresented and make a fully and fairly informed determination as to how to vote.

5. For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Transaction, unless and until the material information discussed below is disclosed to Odyssey's shareholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

8. Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(2). A significant portion of events occurred in this District because Defendants are subject to personal jurisdiction in this District, Odyssey's legal and financial advisors maintain offices in this District, and shareholders of Odyssey reside in this District so Defendants were aware that the Registration Statement would be reviewed in this District. *Santore v. Swaminathan*, No. 17 cv 5742, 2018 U.S. Dist. LEXIS 33352, at *23 (N.D. Ill. Mar. 1, 2018) ("the standard for establishing venue under [the Exchange Act] is not a rigorous one") (quoting *Haskett v. Reliv' Int'l.*, No 94 c 1461, 1994 U.S. Dist. LEXIS 5678, at *6 (N.D. Ill. Apr. 29, 1994)); *see also City of Miami Gen. Emples. & Sanitation Emples. Ret. Trust v. Casey*, No. 22-cv-2371,

2023 U.S. Dist. LEXIS 239991, at *4 (S.D. Ohio Mar. 27, 2023) ("The rule for establishing venue under the Securities Exchange Act is more permissive than under 28 U.S.C. § 1391, consistent with the intent of the venue and jurisdiction provision in the securities laws 'to grant potential plaintiffs liberal choice in their selection of a forum.'") (quoting *Wayne Cnty. Emples.' Ret. Sys. v. MIC Inv. Corp.*, 604 F. Supp. 2d 969, 973 (E.D. Mich. 2009)). Further, Defendants were aware that the Registration Statement would be reviewed in this District. *See Sarantakis v. Gruttadauria*, No. 02 c 1609, 2003 U.S. Dist. LEXIS 4002, at *23 (N.D. Ill. Mar. 17, 2003) ("Venue is appropriate in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district."); *see also Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa. Mar. 6, 1974) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 106 (10th Cir. 1971) (finding venue proper in the District of Utah where the defendant released a false and fraudulent press statement that was printed in the Wall Street Journal and was read and relied upon by the plaintiff in Salt Lake City, Utah).

## PARTIES

9. Plaintiff is, and has been continuously throughout all times relevant hereto, an owner of Odyssey common stock.

10. Defendant Odyssey is a publicly traded company that focuses on ocean exploration and marine resource development that operates on projects such as seafloor mineral resources. Odyssey's common stock trades on the Nasdaq Stock Market (the "Nasdaq") under the ticker symbol "OMEX."

11. Defendant Mark D. Gordon ("Gordon") is Odyssey's Chief Executive Officer and a

Chairman of the Board of Directors of the Company.

12. Defendant Mark B. Justh ("Justh") is a director of the Company.

13. Defendant Jon D. Sawyer ("Sawyer") is a director of the Company.

14. Defendant Todd E. Siegal ("Siegal") is a director of the Company.

15. Defendant Larissa T. Pommeraud ("Pommeraud") is a director of the Company.

16. The defendants identified in paragraphs 11 through 15 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Proposed Transaction

17. In mid-2025, the Board and senior management discussed potential strategic and capital-raising opportunities. Two entities the Company identified as potential strategic partners were Ocean Minerals, LLC ("OLM") and CIC Limited ("CIC Ltd."). At the time, the Company owned approximately 7.0% of OLM and 14.2% of CIC Ltd.

18. In August 2025, Odyssey's lead independent director, Defendant Justh, informed the Defendant Gordon, that CIC LLC ("CIC LLC"), an affiliate of CIC Ltd. and an entity in which Defendant Justh had an ownership interest, was advising AOM with respect to a public project. CIC LLC was controlled by Odyssey's former Chairman of the Board and CEO, Gregory P. Stemm. Defendant Justh also informed Defendant Gordon that a potential transaction between the Company and AOM could be worthwhile since both companies had similar deep-sea mining investments and assets.

19. Thereafter, on August 22, 2025, Gordon and Justh participated in a call with certain AOM representatives to discuss a potential strategic combination. Justh also informed the Company's General Counsel, Susan Fennessy, of his potential conflict of interest arising from his

indirect interest in AOM.

20. On September 3, 2025, the Company's management received a draft proposal letter from AOM outlining a proposed stock-for-stock business combination.

21. On September 5, 2025, the Board agreed that certain terms of AOM's initial proposal, including items such as exclusivity and non-compete provisions, needed to be further negotiated before binding execution. Further, the Board discussed Justh's potential conflict of interest and agreed that Justh would need to recuse himself from actions relating to a potential transaction with AOM.

22. On September 23, 2025, after deliberating and negotiating AOM's initial proposal letter, the Company and AOM entered into a mutual non-disclosure agreement.

23. On October 1, 2025, the Board authorized the formation of the Special Transaction Committee consisting of Defendants Pommeraud, Sawyer, and Siegal to consider and engage in discussions regarding transactions with AOM, OML, CIC Ltd., and CIC LLC.

24. On October 2, 2025, AOM entered into a consulting agreement with Defendant Justh pursuant to which Justh would serve as the CEO and a director of AOM in exchange for a monthly consulting fee of $60,000.00.

25. On October 16, 2025, representatives of Odyssey and AOM jointly delivered to representatives of OML an initial draft summary of terms for the OML Transactions ("OML Transactions") which contemplated a $5.0 million royalty-based investment to be funded by Odyssey or AOM.

26. In early November 2025, the Company and AOM prepared and negotiated proposed term sheets related to strategic transactions involving CIC Ltd. (the "CIC Ltd. Transactions"). AOM then delivered to CIC Ltd. and certain equity holders an initial draft term sheet outlining the

proposed CIC Ltd. Transactions.

27. Additionally, in early November 2025, AOM engaged in discussions with CIC LLC regarding potential transactions (the "CIC LLC Transactions") and delivered a draft term sheet outlining the CIC LLC Transactions.

28. On November 13, 2025, AOM and CIC LLC entered into a term sheet which contemplated an option arrangement pursuant to which AOM would have the right, following the merger with the Company, to acquire CIC's equity interests in CIC Ltd. or the equity interests in CIC LLC.

29. On December 1, 2025, the Special Transaction Committee discussed approaching two significant Odyssey stockholders ("Stockholder A" and "Stockholder B") to gauge their interest in participating more directly in the transaction with AOM.

30. On December 15, 2025, certain representatives of AOM met with representatives of Stockholder A to discuss their interest in participating in the AOM Bridge Financing.

31. On December 16, 2025, the Special Transaction Committee, in consultation with the Company's management, Defendant Justh, and legal and financial counsel discussed the various transactions involving OML, CIC Ltd., and AOM. Additionally, Defendant Gordon confirmed that no other parties had expressed an interest in a business combination with the Company. Thereafter, the Special Transaction Committee authorized Company management to discuss and explore extending exclusivity with AOM.

32. On February 4, 2026, the Company's legal advisor sent an initial draft of the term sheet describing the proposed merger agreement (the "merger agreement term sheet") to AOM's legal counsel. The merger agreement term sheet outlined the structure for a stock-for-stock merger between Odyssey and AOM.

33. Thereafter, during February and March 2026, the parties exchanged revised drafts of the merger agreement term sheet.

34. On April 8, 2026, the parties executed transaction documents including the Merger Agreement, a PIPE Subscription Agreement, a OML Agreement, CIC Ltd. Agreements, and other related documents.

**B. The Proposed Transaction and the Issuance of the Materially Incomplete and Misleading Proxy Statement**

35. On or about April 8, 2026, Odyssey and AOM issued a joint press release to announce the Proposed Transaction, stating in part:

> **American Ocean Minerals Corporation to Merge with Odyssey Marine Exploration, Inc.,**
>
> **Creating a $1B U.S.-Controlled Deep-Sea Critical Minerals Platform**
>
> TAMPA, Fla.--(BUSINESS WIRE) --American Ocean Minerals Corporation ("AOMC") and Odyssey Marine Exploration, Inc. (NASDAQ: OMEX) ("Odyssey") today announced they have entered into a definitive merger agreement to combine their businesses and create a leading deep-sea critical minerals research and resource extraction platform (the "Transaction").
>
> The Transaction values the combined company at approximately $1 billion and includes a private placement of over $150 million from prominent institutional and strategic investors, as well as a $75 million pre-public financing completed in February by AOMC.
>
> Following the Transaction close, the combined company will operate as American Ocean Minerals Corporation and is expected to trade on Nasdaq under the ticker symbol "AOMC", subject to stockholder and regulatory approvals and customary closing conditions
>
> Transaction Details:
>
> The Transaction values the combined company at a pro-forma equity value of approximately $1 billion. Prior to and in connection with the Transaction, AOMC has raised and secured equity commitments totaling more than $230 million from institutional and strategic investors, consisting of a private placement of more than $150 million and a $75 million pre-public financing.

> Prior to closing the Transaction, Odyssey intends to divest its Mexican phosphate asset, PHOSAGMEX, non-core to the combined company, in a transaction expected to preserve potential value for the benefit of pre-closing shareholders of Odyssey. This divestiture is expected to remove approximately $60 million of related liabilities from the Odyssey balance sheet. Following the Transaction and divestiture close, the combined company expects to have more than $175 million in cash available to advance exploration programs across its portfolio.
>
> The Transaction is structured as an all-stock merger, pursuant to which AOMC's outstanding common stock and warrants will be exchanged for Odyssey's common stock and warrants. Prior to the merger, Odyssey intends to effect a 25-for-1 reverse stock split of its common stock. Before the effect of the reverse stock split, the total number of shares of common stock outstanding of the combined company is expected to be approximately 921 million upon closing of the transaction.
>
> The merger agreement has been unanimously approved by the boards of directors of both companies, as well as Odyssey's special transaction committee, and is expected to close in late second quarter or early third quarter of 2026, subject to customary regulatory and shareholder approvals. In connection with the transaction, Odyssey and AOMC have entered into voting agreements with certain significant Odyssey shareholders, accounting for approximately 30% of Odyssey shares of common stock outstanding, pursuant to which such shareholders have agreed to vote in favor of the Transaction.
>
> Advisors
>
> Citigroup Global Markets Inc. ("Citi") and Cantor Fitzgerald & Co. ("Cantor") are serving as Capital Markets Advisors for AOMC and served as Joint Private Placement Agents with respect to AOMC's private placement financing. Cassels Brock & Blackwell LLP and Gibson, Dunn & Crutcher LLP are serving as legal advisors to AOMC in connection with the Transaction. Teneo is serving as strategic communications advisor to AOMC.
>
> Latham & Watkins LLP is serving as counsel to Citi and Cantor.
>
> Moelis & Company LLC is serving as exclusive financial advisor and Allen Overy Shearman Sterling US LLP is serving as legal advisor to Odyssey's special transaction committee in connection with the Transaction. Akerman LLP is legal advisor to Odyssey. Grant Thornton LLP is Odyssey's independent public accounting firm

36. On or about May 11, 2026, the Board authorized the filing of the Registration Statement with the SEC.

## C. <u>The Preclusive Deal Protection Devices</u>

37. The Merger Agreement contains onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

38. The Merger Agreement provides for a termination fee payable to Parent by the Company in the amount of $2.2 million in the event the transaction is not consummated.

39. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

**D. The Materially Incomplete and Misleading Registration Statement**

40. The Registration Statement is materially incomplete and misleading with respect to (i) Defendant Justh's conflicts of interest; (ii) the identity of Stockholder A and Stockholder B, and whether Stockholder A or Stockholder B had any interest or affiliation with AOM, OML, CIC Ltd., or CIC LLC; (iii) the degree to which the exclusivity agreements between the Company and AOM prevented potential alternative strategic partners from initiating contact with the Company; and (iv) the omission of certain financial inputs in the DCF Analysis performed by the Company's financial advisor Moelis & Company LLC ("Moelis").

**i. The Registration Statement is Materially Incomplete and Misleading as to Defendant Justh's potential conflicts of interest during the lead-up to the Proposed Transaction**

41. Defendant Justh's had substantive roles and interests in Odyssey, AOM and CIC:

> Mark B. Justh has served as Odyssey's lead outside director since June 2015 and as chairman of the audit committee of the Odyssey Board since June 2023. Mr. Justh previously made an investment in CIC's parent company, as a result of which he indirectly owns approximately 9.2% of CIC. Mr. Justh also owns approximately 6.8% of the issued and outstanding shares of AOM Common Stock, and has been the Chief Executive Officer of AOM since October 2025. The parties anticipate that Mr. Justh will serve as the chief executive officer and as a member of the board of directors of the combined company following the Merger.

Registration Statement at 98.

42. These interests in AOM and CIC-related entities motivated Defendant Justh to recommend that Odyssey explore a potential strategic transaction with AOM.:

> Mr. Justh also noted that AOM was evaluating investments in CIC Limited and other companies in the polymetallic nodule industry, potential strategic alternatives and that ***a potential transaction involving Odyssey could warrant consideration*** in light of the parties' complementary deep-sea mining investments, assets and capabilities.
>
> Following these discussions, ***Mr. Gordon asked Mr. Justh to facilitate introductions to AOM*** and its representatives.

Registration Statement at 75 (emphasis added).

43. Following these initial introductory discussions, select members of the Company's management, including Justh, and AOM engaged in "high-level views" regarding a potential transaction between the Company and AOM:

> On September 4, 2025, Odyssey management proposed a form of mutual non-disclosure agreement to AOM and its representatives. On the same date, Messrs. Justh and Gordon and Ms. Fennessey met with Philip Plough and certain AOM representatives ***to exchange high-level views regarding a potential business combination and the AOM team's experience developing and financing complex projects.***

Registration Statement at 76 (emphasis added).

44. Following the September 4, 2025 meeting, the Board held an additional meeting where it was determined that Defendant Justh, not surprisingly, would need to recuse himself from future actions related to the transaction between the Company and AOM:

> The Odyssey Board held a meeting on September 5, 2025, to discuss the potential opportunity and the AOM Proposal Letter. At the outset of that meeting, Ms. Fennessey advised the Odyssey Board that Mr. Justh had disclosed a potential conflict of interest due to his indirect ownership in AOM, ***confirmed that he would recuse himself from actions relating to the consideration of the potential transaction*** and, as appropriate, from meetings and discussions of the Odyssey Board, and recommended measures consistent with Odyssey's code of ethics and historical practices regarding conflicts of interest.

Registration Statement at 76 (emphasis added).

45. Roughly a month later, on October 2, 2025, and unknown to Odyssey, Defendant Justh was elected as the only executive officer of AOM, pursuant to which he would be paid a monthly "consulting fee" of $60,000.00. Registration Statement at 181.

46. The Registration Statement is silent as to the nature of Defendant Justh's consultations and whether any restrictions or agreements were in place to preclude him from sharing or otherwise using his inside information about Odyssey and its operations with AOM or other parties with which he may have been affiliated and with which Odyssey was negotiating potential agreements. Alternatively, it is not known whether any procedural protections were in place between the Company and AOM to mitigate or protect the Company in light of Defendant Justh's overlapping and obviously conflicted loyalties.

47. Such information is by no means immaterial because, even though the Company established a Special Transaction Committee on October 1, 2025 to oversee negotiations with AOM and other entities and Defendant Justh claimed he would be "recusing" himself from future meetings due to potential conflicts of interest, Defendant Justh still appears substantively involved in negotiations between Odyssey and AOM while working concurrently for both companies.

48. For example, shortly after becoming AOM's sole executive officer on October 2, 2025, Defendant Justh was involved directly in discussions and deliberations along with the Special Transaction Committee when evaluating and executing AOM's initial proposal letter:

> On October 8, 2025, the Special Transaction Committee held a meeting ***attended by members of Odyssey's management and Mr. Justh***, at which the parties ***discussed the AOM Proposal Letter, protections for Odyssey*** if a transaction were not consummated, relative valuation considerations, the potential value of and impact on Odyssey's net operating loss carryforwards, and proposed exclusivity provisions with respect to CIC Limited and OML. Following this discussion and revisions consistent with the Special Transaction Committee's guidance, the

> Special Transaction Committee approved, by written consent, ***the signing of the definitive AOM Proposal Letter, which was executed later that day by Odyssey and AOM.***

Registration Statement at 77 (emphasis added).

49. In fact, Defendant Justh appears to have been responsible for influencing and supplying valuation materials to the Special Transaction Committee when the Company was evaluating its side transactions with OML and CIC Ltd.:

> On October 21, 2025, the Special Transaction Committee held a meeting attended by members of Odyssey's management, Mr. Justh, and representatives of Allen Overy Shearman Sterling US LLP ("A&O Shearman") to discuss an appropriate process for evaluating the Potential Transactions. At the meeting, Mr. Gordon provided an update on the status of the Potential Transactions, which ***Mr. Justh supplemented with additional context regarding valuation considerations relating to OML and CIC Limited***

Registration Statement at 77 (emphasis added).

50. The Registration Statement again is silent what these valuation considerations were and what safeguards were in place to ensure that Defendant Justh's was not compromising the Company's negotiating positions. Specifically, it is unknown whether Defendant Justh was acting as an agent for AOM or Odyssey and whether such "valuation considerations" were based on AOM's or CIC Ltd.'s considerations or data/inputs which could fundamentally influence or direct Odyssey's positions with respect to these side transactions.

51. Indeed, Defendant Justh's intimate involvement in the Special Transaction Committee's internal discussions is especially concerning given that the Registration Statement suggests that the Company and Defendant Gordon himself may not have been entirely privy to the full extent of Defendant Justh's formal role with AOM until November 2025: "On November 12, 2025, it was proposed by AOM to Mr. Gordon that Mr. Justh be appointed as interim chief executive officer of AOM." Registration Statement at 79.

52. Similarly, for almost a month the Special Committee seems to have had no knowledge of Defendant's Justh's executive role with AOM and during its deliberations and the potential for Defendant Justh to share sensitive information with his numerous and conflicting affiliations. Only in November 2025 did Defendant Gordon either become aware of or notify the Special Transaction Committee of Defendant Justh's executive role with AOM:

> On November 19 and 20, 2025, Mr. Gordon met with Mr. Justh and certain representatives of AOM for a series of meetings with representatives of OML and Transocean. ***Mr. Gordon reported to the Special Transaction Committee in a detailed email regarding the substance of the meetings, the proposal that Mr. Justh serve as AOM's interim chief executive officer, and Mr. Gordon's subsequent communications with Mr. Justh concerning the proposal, during which Mr. Justh indicated his willingness to serve as AOM's chief executive officer.*** On October 2, 2025, AOM entered into a consulting arrangement with Mr. Justh in connection with his leadership role.

Registration Statement at 79-80 (emphasis added).

53. Given that Defendant Justh was intimately involved in the deliberations for both the Company and AOM, the Registration Statement obfuscates Defendant Justh's participation and/or role in negotiations. Instead, the Registration Statement simply refers to Company interactions with "representatives of AOM, especially in connection with close negotiations with Defendant Gordon with respect to the side transactions leading up to the Proposed Transaction:

> On December 2, 2025, Mr. Gordon and ***representatives of AOM*** met to discuss certain deal-related points, Mr. Gordon participated in a call with an Odyssey Stockholder to discuss potential participation in the AOM Bridge Financing and met with representatives of Capital Latinoamericano, S.A. de C.V. ("CapLat"), an Odyssey Stockholder and Odyssey's joint venture partner in connection with Odyssey's Mexican Phosphate Project, to discuss the status of that business.

Registration Statement at 80 (emphasis added).

54. Similarly, a "representative" of AOM even appears to have accompanied Defendant Gordon in independently negotiating important side transaction such as the terms of the divestment of the Mexican Phosphate Project:

> On March 5, 2026, Mr. Gordon and ***a representative of AOM*** met separately with a representative of Poplar Falls to discuss the proposed divestment of the Mexican Phosphate Project

Registration Statement at 84 (emphasis added).

55. As it stands, the Registration Statement fails to disclose whether Defendant Justh is the AOM "representative" or one of the "representatives. A reasonable stockholder cannot evaluate whether side transactions were negotiated at arm's length or whether conflicted participants may have influenced the side transactions.

56. The roles, capacities of engagement, and chronology of Defendant Justh's activities with respect to the negotiations between AOM and/or Odyssey and other parties are obviously material to the reasonable stockholder. The Registration Statement identifies Defendant Justh as simultaneously holding positions, economic interests, and influence across multiple entities involved in the Proposed Transaction while, at the same time, participating in material discussions concerning valuation, exclusivity, financing, and transaction structure.

57. Although the Registration Statement states that Defendant Justh disclosed a potential conflict and agreed to recuse himself from matters relating to the transaction, the chronology thereafter repeatedly places Defendant Justh in meetings involving the Special Transaction Committee and discussions relating to valuation considerations concerning OML and CIC Limited. Accordingly, a reasonable stockholder would consider it important to understand the precise scope of Defendant Justh's involvement, the effectiveness of his purported recusal, whether he participated in negotiations or valuation discussions on behalf of Odyssey, AOM, or both, and whether appropriate safeguards existed to manage the overlapping interests and potential conflicts.

**ii. The Registration Statement is Materially Incomplete and Misleading as to the identities and role of "Stockholder A" and "Stockholder B"**

58. The Registration Statement fails to disclose whether Stockholder A and Stockholder B had any potential conflicts of interest or other motivations in influencing the Proposed Transaction through their potential participation in the financing for the overall transaction:

> On December 1, 2025, the Special Transaction Committee held a meeting attended by Ms. Fennessey and representatives of A&O Shearman and Moelis to discuss potential approaches for engaging significant Odyssey Stockholders in connection with a potential transaction with AOM. The Special Transaction Committee considered the potential benefits and risks of Mr. Gordon discussing a potential transaction with AOM with certain significant Odyssey Stockholders ("Stockholder A" and "Stockholder B") and facilitating introductions between such Odyssey Stockholders and AOM and its representatives. The Special Transaction Committee also discussed the potential participation of Stockholder A and Stockholder B in AOM's proposed financing, including a potential bridge financing that would permit participating investors to participate in subsequent transactions meeting specified criteria. Following the discussion, the Special Transaction Committee authorized Mr. Gordon to continue discussions regarding potential financing approaches involving certain significant Odyssey Stockholders.

Registration Statement at 80.

59. Thereafter, representatives of Stockholder A and Stockholder B directly deliberated and discussed financing structures with AOM to fund the Proposed Transaction:

> On December 3, 2025, Mr. Justh and certain representatives of AOM met with a representative of Stockholder A to discuss the Potential Transactions. Representatives of Stockholder A subsequently met with Mr. Gordon and CapLat to discuss the Potential Transactions.

Registration Statement at 80.

…

> During January 2026 and early February 2026, Messrs. Justh and Gordon, along with certain representatives of AOM, met with representatives of Stockholder A and B and CapLat to discuss the Potential Transactions and conducted diligence on CIC and its regulatory posture

Registration Statement at 81.

60. The "Potential Transactions" discussed in the December 2025, January 2026, and February 2026 directly involve the side transactions pertaining to OLM, CIC Ltd., and CIC LLC,

all of which were closely involved in and evaluated by the Company and AOM's considerations for a strategic combination. Registration Statement at 77.

61. The Registration Statement is silent as to whether Stockholder A or Stockholder B had any material relationships, ownership, or connection to OLM, CIC Ltd., and CIC LLC which may have influenced the financing schematic potentially undertaken by either of these stockholders and AOM. Indeed, relationships with any of the Potential Transaction parties is especially important as these parties directly influenced the valuation of AOM. In fact, Moelis' DCF Analysis valued AOM based on "AOM's 95.5% ownership interest in OML and 36.1% ownership interest in CIC Limited," with the foregoing range of discount rates to calculate estimated present values as of December 31, 2025, of the estimated after-tax unlevered free cash flows of AOM reflected in the financial forecasts (using a mid-year discounting convention)." Registration Statement at 110.

62. In fact, such information is especially material as multiple individuals involved in the Proposed Transaction possessed substantive and meaningful equity or connections to the entities involved in the Potential Transactions.

63. For example, in addition to Defendant Justh possessing a stake in CIC-related entities and AOM, the Registration Statement discloses that "CIC LLC, which is controlled by ***Odyssey's former Chairman of the Board and Chief Executive Officer, Gregory P. Stemm***, ***is a significant equity holder in CIC Limited***, and Odyssey had previously provided services to CIC LLC; its members also are significant equityholders in AOM." Registration Statement at 78 (emphasis added).

64. In addition to Stockholder A or Stockholder B's potential connection to OML, CIC Ltd., or CIC LLC, the Registration Statement also fails to disclose whether either Stockholder A or Stockholder B have any substantial connection to AOM and their financing structure for the

Proposed Transaction. "On December 15, 2025, certain representatives of AOM met with representatives of Stockholder A to discuss potential participation in the AOM Bridge Financing." (Registration Statement at 81).

65. Indeed, the Registration Statement provides the following representation regarding AOM's Bridge Financing:

> **AOM Bridge Subscription Agreements**
>
> Prior to the execution and delivery of the Merger Agreement, AOM entered into subscription agreements (the "Bridge Subscription Agreements") ***with certain third-party investors (the "AOM Bridge Investors")*** pursuant to which the AOM Bridge Investors provided aggregate financing to AOM in the amount of approximately $75.6 million through the purchase of convertible debentures of AOM (the "AOM Bridge Debentures"). The AOM Bridge Debentures will automatically convert into shares of AOM Common Stock immediately prior to the Effective Time, such that the AOM Bridge Investors will become stockholders of AOM immediately prior to the consummation of the Merger.

Registration Statement at 129 (emphasis added).

66. As such, the "AOM Bridge Investors" provided substantial financing to the overall transaction that was crucial for the overall transaction to progress. Also, as a result of their substantial financial contribution, AOM Bridge Investors stand to hold 10.7% of the combined company post-closing. Registration Statement at 23.

67. In addition to their significant equity in the post-closing company, the AOM Bridge Investors are entitled to more favorable lock-up rights and appraisal rights compared to other parties or Company stockholders involved in the Proposed Transaction.

68. Specifically, AOM Bridge Investors are only subject to a 60-day lock-up period post-closing as opposed to AOM stockholders being subject to a 90-day lock-up period:

> **Lock-Up Agreements**
>
> Odyssey and holders of AOM Common Stock, and the AOM Bridge Investors (the "Lock-Up Holders"), entered into lock-up agreements (the "Lock-Up

> Agreements") pursuant to which, during the applicable lock-up periods commencing on the date of the Closing, the Lock-Up Holders will not, directly or indirectly, sell or otherwise transfer any shares of Odyssey Common Stock, or make any public announcement or filing under applicable securities laws regarding any of the foregoing received in connection with the bridge transaction; provided that (a) ***the AOM Bridge Investors are subject to a full lock-up for a period of sixty (60) days following the Closing***, with all such shares released thereafter, and (b) ***holders of AOM Common Stock are subject to a full lock-up through ninety (90) days following the Closing***, followed by staged releases thereafter. Notwithstanding the foregoing, the restrictions will not apply to transfers (a) by gift or for estate-planning purposes, (b) by will or intestacy upon death, (c) to any affiliate, trust, partnership, or other entity for the benefit of the Lock-Up Holder or its immediate family, or (d) in the case of an entity, to its members, partners or stockholders, provided that the transferee agrees in writing to be bound by the applicable restrictions. Any purported transfer by the Lock-Up Holders of Odyssey Common Stock in violation of the foregoing restrictions will be null and void and will not be recognized by Odyssey or its transfer agent.

Registration Statement at 133 (emphasis added).

69. Additionally, only select AOM Bridge Investors are entitled to appraisal rights whereas Odyssey and AOM stockholders are not:

> Odyssey Stockholders are not entitled to appraisal rights in connection with the Merger.
>
> ...
>
> AOM Stockholders of record and "beneficial owners" (as defined in Section 262 of the DGCL) are entitled to appraisal rights in connection with the Merger under Section 262 of the DGCL. However, all Current AOM Stockholders and the AOM PIPE Investors, who will become AOM Stockholders immediately prior to the Effective Time, have waived appraisal rights in connection with the Merger. Certain AOM Bridge Investors, who will also become AOM Stockholders immediately prior to the Effective Time, have waived appraisal rights, ***while other AOM Bridge Investors have not, as of the date of this proxy statement/prospectus, waived appraisal rights***.

Registration Statement at 115-116 (emphasis added).

70. While the Registration Statement does not directly state who such AOM Bridge Investors are, Article II of the Merger Agreement suggests that the Company and AOM are well aware of their identities:

> **Section 2.1 Closing Date Statement**. Not less than five (5) Business Days prior to the Closing Date, AOM shall deliver to Odyssey a statement, signed by AOM's Chief Executive Officer, that (A) ***identifies each AOM Stockholder of record, as well as each Bridge Investor*** and PIPE Investor who will, pursuant to the Subscription Agreements, become an AOM Stockholder immediately prior to the Closing, (B) specifies the number of shares of AOM Common Stock owned (or to be owned immediately prior to the Closing) by each such AOM Stockholder, Bridge Investor, or PIPE Investor, and (C) with respect to each AOM Stockholder identified on Section 2.3(d) of the AOM Disclosure Schedule, sets forth the number of shares of Odyssey Common Stock that such AOM Stockholder will be entitled to receive pursuant to this Article II, together with the beneficial ownership (as defined in Section 13(d) of the Exchange Act) of shares of Odyssey Common Stock held by such AOM Stockholder immediately after the Effective Time, including the beneficial ownership of shares of Odyssey Common Stock held by such AOM Stockholder's Affiliates, in each case as reasonably necessary to enable Odyssey and the Exchange Agent to determine and effect the proper allocation of Merger Consideration between Odyssey Common Stock and Odyssey New Preferred Shares pursuant to Section 2.3(d) (the "**Closing Date Capitalization Statement**").

Registration Statement at A-8 (emphasis added).

71. The identities, relationships, and economic incentives of the AOM Bridge Investors are material to reasonable stockholders because those investors provided financing that was essential to the consummation of the Proposed Transaction while simultaneously receiving substantial post-closing equity interests and more favorable rights than other transaction participants. Accordingly, a reasonable stockholder would consider it important to know whether Stockholder A, Stockholder B, or any other persons involved in discussions concerning the Potential Transactions ultimately participated in the AOM Bridge Financing, whether such investors possessed relationships or interests connected to AOM, CIC Ltd., CIC LLC, or OML, and whether those interests may have influenced the structure, financing, timing, or negotiation of the Proposed Transaction. Additionally, because Odyssey and AOM stockholders are not entitled or otherwise waived appraisal rights, the reasonable stockholder would consider the identities of which of the AOM Bridge Investors are entitled to appraisal rights.

**iii. The Registration Statement is Materially Incomplete and Misleading as to what extent exclusivity agreements between the Company and AOM may have hindered potential alternative strategic partners**

72. The Registration Statement fails to disclose whether exclusivity agreements between the Company and AOM may have prohibited potential alternatives strategic partners or transactions.

73. The Registration Statement only suggests that the Company and AOM agreed to negotiate exclusively on or around October 8, 2025 after the signing of the definitive AOM Proposal Letter (the "October 8, 2025 exclusivity agreement"). Registration Statement at 77.

74. The Registration Statement does not disclose the terms of the October 8, 2025 exclusivity agreement including substantive terms such as the length of exclusivity or whether the Company was entitled to terminate exclusivity upon the receival of a superior offer.

75. Such terms related to exclusivity are only further confused as the Registration Statement only states that: "On March 5, 2026, following approval by the Special Transaction Committee, Odyssey and AOM agreed to extend exclusivity to April 6, 2026." Registration Statement at 84.

76. The terms of the exclusivity are especially material to the reasonable stockholder considering that the Company did receive an indication of interest outside of AOM and did not explore such interest because of exclusivity agreements between the Company and AOM:

> On March 12, 2026, a representative of J.P. Morgan emailed Mr. Gordon requesting a call on behalf of an ***unidentified client interested in exploring a potential M&A opportunity with Odyssey***. At the next meeting of the Special Transaction Committee on March 17, 2026, the Special Transaction Committee was informed of the J.P. Morgan inquiry and discussed potential responses. Following discussions with AOM and AOM's counsel, and ***in light of the mutual exclusivity agreement between Odyssey and AOM, Mr. Gordon did not respond to the J.P. Morgan inquiry***, and no further follow-up from J.P. Morgan was received.

Registration Statement at 84 (emphasis added).

77. Lacking further information concerning the scope and effect of the exclusivity arrangement between the Company and AOM, the Registration Statement remains incomplete regarding the extent to which the Special Transaction Committee retained flexibility to consider alternative proposals during the lead up to the Proposed Transaction. Specifically, the Registration Statement does not disclose the specific terms of the exclusivity arrangement, including whether it contained fiduciary-out provisions, permitted engagement with unsolicited third-party interest, or restricted merely negotiation as opposed to preliminary informational discussions. Such information is material as the reasonable stockholder must be able to assess whether the Company was effectively constrained by contractual terms that may have limited expressions of interest by third-parties.

**iv. The Registration Statement is Materially Incomplete and Misleading as to Moelis' DCF Analysis**

78. The Registration Statement omits key information and inputs critical for the reasonable stockholder to evaluate the Company.

79. Indeed, the Registration Statement provides the following DCF Analysis for the Company:

***Discounted Cash Flow Analysis—Standalone***

Utilizing financial forecasts, on which Moelis was directed by Odyssey to rely for purposes of its financial analysis and opinion, Moelis performed a discounted cash flow ("DCF") analysis of each of Odyssey and AOM to calculate the present value of the estimated future unlevered free cash flows reflected in such forecasts to be generated by Odyssey and AOM. In its analysis of each of Odyssey and AOM, Moelis (i) accounted for the unlevered free cash flows attributable to Odyssey's and AOM's respective ownership interests in the Operating Assets as reflected in financial forecasts for each of the Operating Assets based on projected financial data provided to Odyssey by the Operating Assets (and as adjusted based on commodity price assumptions from Odyssey), and approved for Moelis' use by Odyssey and (ii) accounted for the unlevered free cash flows from the corporate overhead expense for each of Odyssey and AOM based on projected financial data provided by Odyssey, and approved for Moelis' use by Odyssey. Moelis did not give effect to Odyssey's interest in the Mexican Phosphate Project, which was assumed, at Odyssey's direction, to be separated from Odyssey prior to closing of the Merger.

Moelis calculated unlevered free cash flows for each of the Operating Assets as EBITDA, (i) less unlevered cash taxes, (ii) less capital expenditures, and (iii) plus or minus changes in working capital, as provided, and approved for Moelis' use, by Odyssey. The financial forecasts for the Operating Assets included free cash flows for the calendar years ending December 31, 2026, through December 31, 2064 (for OML) and through 2047 (for CIC Limited). At the direction of Odyssey, no terminal values were included for the Operating Assets (or Odyssey or AOM) as the financial forecasts for the Operating Assets were developed for their respective expected asset lives.

In its analysis, Moelis applied a range of discount rates as indicated below for Odyssey and AOM, based on an estimated range of weighted average cost of capital (the "WACC") for each of Odyssey and AOM.

Registration Statement at 109

80. The DCF Analysis specifically states that "At the direction of Odyssey, no terminal values were included for the Operating Assets (or Odyssey or AOM) as the financial forecasts for the Operating Assets were developed for their respective expected asset lives." Registration Statement at 109.

81. The exclusion of terminal value assumptions is material to the reasonable stockholder as it affects the output of the DCF analysis because it eliminates any valuation attributable to cash flows beyond the discrete forecast period, a component that in many going-concern DCF analyses represents a substantial portion of total enterprise value. Further, the Registration Statement does not explain whether the exclusion of terminal value assumptions may have impacted the implied equity value range presented to stockholders.

**COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

48. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

49. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

50. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and

in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

52. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the misleading Proxy, which attempts to minimize the number of shares voting against the Proposed Transaction.

53. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

54. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual

Defendants were required to, separately, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

55. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligent, recklessness, or intentional conduct.

56. The Company is also deemed negligent, reckless, or intentional as a result of the Individual Defendants' intent in preparing and reviewing the Proxy.

57. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

58. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

59. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

60. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

62. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

63. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

64. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate

result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

65. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or taking any steps to consummate the Proposed Transaction, until the Company issues curative disclosures that fully address the deficiencies in the Proxy Statement;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 18, 2026

**ADEMI LLP**

By: */s/ John D. Blythin*
Guri Ademi
John D. Blythin
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
Fax 414-482-8001
gademi@ademilaw.com
jblythin@ademilaw.com

*Attorneys for Plaintiff*